## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

ANDRE L. FAIRCLOTH,

                Plaintiff,

v.                                      ACTION NO. 2:13cv156

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

                Defendant.

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

      This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.

      Plaintiff Andre L. Faircloth brought this action under 42 U.S.C. §§ 405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying Mr. Faircloth's applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act. The undersigned recommends that the decision of the Commissioner be REVERSED and the case be REMANDED under the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent with this recommendation.

# I. <u>PROCEDURAL BACKGROUND</u>

Mr. Faircloth protectively applied for DIB on June 11, 2010, and SSI on June 25, 2010, alleging disability since August 1, 2008, caused by hemophilia (factor VIII deficiency), total hip replacement, and knee problems. R. 197-213, 242.[1]   Mr. Faircloth's applications were denied initially and on reconsideration. R. 96-141.   Mr. Faircloth requested a hearing by an Administrative Law Judge (ALJ), which occurred on February 22, 2012. R. 53-73.   Mr. Faircloth, who was represented by counsel, and a vocational expert testified before the ALJ. R. 53-73.

On March 6, 2012, the ALJ found that Mr. Faircloth was not disabled within the meaning of the Social Security Act. R. 39-52.   Mr. Faircloth submitted additional evidence to the Appeals Council, including a letter brief, medical records, and a letter from Mr. Faircloth's treating oncologist, Dr. Snehal Damle, dated August 2, 2012. R. 1-5.   While including the remaining exhibits, the Appeals Council did not make Dr. Damle's letter part of the record on appeal, as it contained new information that would not affect the decision about whether Mr. Faircloth was disabled on or before March 6, 2012. R. 2.[2]  The Appeals Council denied Mr. Faircloth's request for administrative review of the ALJ's decision. R. 1-7. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481 (2012).   Mr. Faircloth timely filed this action for judicial review pursuant to 42 U.S.C. § 405(g).   On July 10, 2013, Mr. Faircloth moved for

---

[1] The citations in this Report and Recommendation are to the Administrative Record. ECF No. 6.
[2] Mr. Faircloth argues this Court should consider Dr. Damle's letter dated August 2, 2012, in determining whether substantial evidence supported the ALJ's decision. Pl's Mem. 12, citing *Gough v. Comm'r of Soc. Sec.*, No. 6:07cv18, 2006 U.S. Dist. LEXIS 97531 (W.D. Va. May 12, 2008) (J. Urbanski) (reviewing evidence referenced in the Notice of Appeals Council Action as the Appeals Council evaluated the evidence before declining review). The Court is recommending a finding that there is not substantial evidence in the record to support the ALJ's decision even without considering Dr. Damle's letter. Pl's Mem. Ex. 1. Therefore, the Court has not considered Dr. Damle's letter, attached as Exhibit 1 to the memorandum in support of motion for summary judgment, in making this Report and Recommendation.

summary judgment reversing the ALJ's finding that Mr. Faircloth was not disabled and awarding benefits. ECF No. 11.  In the alternative, Mr. Faircloth requested remanding the case to the ALJ for further proceedings.  On August 9, 2013, Defendant moved to remand the case to the ALJ pursuant to the fourth sentence of 42 U.S.C. § 405(g). ECF No. 18.  In Mr. Faircloth's reply filed August 26, 2013, he requests a reversal of the ALJ's decision and an immediate award of benefits. ECF No. 19.

## II. <u>FACTUAL BACKGROUND</u>

### A.     **Medical Background – Prior to the Alleged Onset Date**

Born in 1967, Mr. Faircloth was forty-one years old on his alleged onset date of August 1, 2008. R. 56, 426.  Mr. Faircloth completed two years of college, and has past relevant work as a network engineer. R. 56, 233-37, 257.  Mr. Faircloth was diagnosed with hemophilia when he was sixteen years old, and his condition has progressively gotten worse. R. 65, 426.

Mr. Faircloth has suffered spontaneous bleeds in his leg, arm, shoulder, abdomen, and hip. R. 66.  His blood condition has led to several surgeries. R. 348. Between 1993 and 1994, he had two throat surgeries – one tracheostomy following multiple bleeding in the lung and one exploratory laparotomy for retroperitoneal hematoma. R. 348, 426. In 1998, Mr. Faircloth received a left hip replacement for avascular necrosis, caused by blood pooling in his hip. R. 66, 426.

### B.     **Medical Records After the Alleged Onset Date – August 1, 2008**

On January 31, 2010, Mr. Faircloth checked into Depaul Medical Center in Norfolk, Virginia, stating someone had fallen into his right leg the day before, and he believed he needed a factor VIII transfusion. R. 343.  The treating physician concluded Mr. Faircloth had a possible small suprapatellar joint effusion, and ordered a 5,000 unit transfusion of intravenous factor VIII.

R. 344-45.

On July 10, 2010, Mr. Faircloth completed a Function Report stating he could not sleep through the night due to his pain. R. 249-50. He needed assistance getting around and with bathing due to balance and stability issues. R. 250. When he awoke, he generally could not move around unaided before using a heated massage unit to loosen his back. R. 250. Throughout the day, both standing and sitting for extended periods of time were extremely painful, and Mr. Faircloth required both a cane and a knee brace at all times. R. 249, 255. He could not drive, and left the house only two to three times a week. R. 249, 252-53. His wife provided for the family – working, shopping, cooking, and cleaning. R. 250, 252. Due to his pain and "extreme discomfort," Mr. Faircloth could not participate in social events, and spent his days moving between the bedroom and the living room, watching TV or reading. R. 253-54.

On August 7, 2010, Mr. Faircloth was evaluated by Dr. Stephen Vaughan, an examining state agency medical consultant. R. 43, 347-51. At the time of the examination Mr. Faircloth was six feet, three inches tall and weighed 275 pounds. R. 348-49. Mr. Faircloth exhibited an "unsteady gait," and on a Romberg's test "he became unsteady due to imbalance of lower extremities (right knee and left hip)." R. 350. Mr. Faircloth also had some limitations in his range of motion. R. 350. Noting Mr. Faircloth "provided us with his best effort during the examination," Dr. Vaughan concluded Mr. Faircloth could "be expected to sit for 2 hours, stand 10 minutes and walk 5 minutes at a time in an eight hour work day before requiring a break due to pain instability of left hip and right knee." R. 351. He found that Mr. Faircloth needed "an assistive device" in order to walk "short distances, long distances and uneven terrain." *Id.* Finally, Dr. Vaughan concluded Mr. Faircloth could not bend, stoop, crouch, or perform similar activity "due to lower extremity instability and pain," and Mr. Faircloth could "carry 10 pounds

4

frequently and 20 pounds occasionally." *Id.*

On August 20, 2010, Michael Cole, DO, a non-examining state agency physician reviewed Mr. Faircloth's record and completed a disability determination explanation. R. 96-106. Dr. Cole noted that Dr. Vaughan's opinion was "partially consistent with the evidence, with the exception of lifting and carrying limitations. We feel that since [Mr. Faircloth] requires use of cane for all ambulation he should be expected to lift and carry no more than 10 [pounds] occasionally and frequently." R. 101. Dr. Cole found Mr. Faircloth retained the ability to walk up to two hours a day with the use of an assistive device, and sit for six hours in an eight-hour day; to occasionally climb ramps and stairs, balance, and stoop; and, to lift and carry light items; but, he must avoid exposure to hazards such as machinery and sharp objects. R. 101-106. Dr. Cole concluded Mr. Faircloth was capable of sedentary work. R. 101-106.

On February 1, 2011, Robert Castle, MD CMC FACC FAAP, another non-examining state agency physician reviewed Mr. Faircloth's record and completed a disability determination explanation. R. 120-29. Dr. Castle found no new allegations of changes or worsening of Mr. Faircloth's condition, and affirmed Dr. Cole's finding that Mr. Faircloth retained the RFC to perform sedentary work. R. 123.

On January 7, 2012, Mr. Faircloth checked into the emergency room at the Maryview Medical Center in Portsmouth, Virginia, stating, "I felt something pop in my hip and in my knee, my hip feels really tight and my knee is swollen. I'm a hemophiliac and it feels like I'm having a bleed." R. 373 An x-ray of Mr. Faircloth's knee revealed a small supraptellar joint effusion. R. 380. The doctors noted Mr. Faircloth had a "possible hemarthrosis," but decided against an arthrocentesis "as it may cause further bleeding." R. 375. Mr. Faircloth was discharged after receiving a 2,000 unit transfusion of intravenous factor VIII with prescriptions for Percocet,

Oxycodone, and Acetaminophen. R. 383.

On January 17, 2012, Mr. Faircloth's wife brought him to the emergency room at the Maryview Medical Center. R. 360. Mr. Faircloth reported, "I feel like my factor is low. I am dizzy and nauseous and my knee is tight, it feels like it is filling up with blood." R. 360. The treating physician noted that Mr. Faircloth was a "moderate severity VIII hemophiliac with recurrent hemarthrosis." R. 362. X-ray computed tomography ("CT") scans revealed no hip effusion, but a "small suprapatellar effusion and degenerative disease" in Mr. Faircloth's right knee. R. 366. The doctor ordered a 5,000 unit transfusion of intravenous factor VIII, but as the hospital only had 3,000 units available, Mr. Faircloth received 3,000 units. R. 362.

On January 31, 2012, Mr. Faircloth's family nurse practitioner filled out a certification for disabled parking placards with the DMV. R. 416-17. The nurse practitioner opined that Mr. Faircloth was severely limited in ability to walk due to an arthritic, neurological, or orthopedic condition; he could not walk without the use of a cane; and, he could not walk more than 200 feet without stopping to rest. R. 417. She indicated Mr. Faircloth was "permanently limited or impaired." Id.

On February 1, 2012, Mr. Faircloth began seeing Dr. Snehal Damle of Virginia Oncology Associates. R. 80-82. Dr. Damle noted Mr. Faircloth had a previously documented factor VIII level of 4%, and following receipt of 8,000 units of factor VIII concentrate, he showed a factor VIII level of 10%. R. 80. Mr. Faircloth was experiencing right hip and right knee pain with swelling above the knee. R. 81. Dr. Damle reviewed an x-ray taken of Mr. Faircloth's knees on January 17, 2012, which showed a small suprapatellar effusion. R. 81. Dr. Damle described Mr. Faircloth as an obese male who appears chronically sick. R. 81. She started Mr. Faircloth on weekly factor VIII infusions, prescribed Vicodin, and referred him to an orthopedist for

management of his degenerative arthritis secondary to hemarthrosis. R. 82, 418, 426-27.

On February 7, 2012, Mr. Faircloth saw Ernesto Luciano-Perez, M.D., of Virginia Orthopaedic & Spine Specialists. R. 386-87. The doctor noted Mr. Faircloth "has hemophilia and has had a lot of bleeding incidents," and Mr. Faircloth's pain was both "constant and severe to extremely severe" and "associated with swelling, numbness, and weakness, which is worsening." R. 387. Mr. Faircloth's gait was antalgic, and  examination of his right knee revealed mild swelling with diffuse tenderness, and "degenerative changes," which were "moderate in severity." R. 387.

An MRI performed on February 8, 2012, revealed a "moderate sized joint effusion" and "thickened suprapatellar plica," as well as "[d]egenerative joint disease, mild with areas of chondromalacia." R. 388-89. Also on February 8, 2012, Mr. Faircloth received a transfusion of 1831 units of intravenous factor VIII at the Bon Secours Maryview Medical Center Outpatient Infusion Center. R. 430-31. Mr. Faircloth reported hip and knee pain, as well as nausea. R. 430.

On February 15, 2012, Mr. Faircloth again received a transfusion of 1831 units of intravenous factor VIII at Bon Secours Maryview. R. 423-24. He reported hip pain, tingling, a slight edema, as well as nausea and lack of appetite. R. 423.

On February 16, 2012, Dr. Damle noted Mr. Faircloth had "experienced 2-3 episodes of bleeding/hemarthrosis in a 7-10 day period," and he was "set up to receive recombinant factor VIII concentrate at the Maryview Infusion Clinic once a week." R. 426. Summarizing Mr. Faircloth's symptoms, Dr. Damle noted, "[h]e has severe right hip and right knee pain from recurrent hemarthrosis. He has difficulty in ambulation. At today's visit, he reports continued problem[s] with the right hip and knee joint pain, more so in the right knee. He is also noticing upper abdominal pain with swelling in the epigastric area." R. 426. Dr. Damle described Mr.

Faircloth's condition as "[h]emophilia and chronic disabling arthritis following hemarthrosis, [and] avascular necrosis of the left hip," and concludes that Mr. Faircloth "is disabled." R. 426. Specifically, she found that Mr. Faircloth suffered from "[h]emophilia, baseline factor VIII more than 4%" and "[r]ecurrent hemarthrosis and degenerative arthritis secondary to hemophilia." R. 427. She noted that if "the patient continues to have frequent bleeding episodes, he will be scheduled for twice a week infusion of factor VIII concentrate." R. 427.

Mr. Faircloth received another transfusion of 1831 units of intravenous factor VIII at Bon Secours Maryview on February 21, 2012. R. 436-37. He again noted pain, tingling, edema, nausea and a loss of appetite. R. 436-37.

On February 21, 2012, Dr. Damle filled out a Medical Evaluation Report describing Mr. Faircloth's condition. R. 418-20. She determined that Mr. Faircloth's hemarthritis in his hips and knees caused him pain and fatigue sufficient to affect his concentration and to create an inability to stay on task in a work setting for 50-60% of the day. *Id.* Mr. Faircloth's condition would require him to take extra rest breaks totaling more than one hour in an eight-hour workday, and would render him unable to work at all 12 to 14 days per month at any level of exertion. *Id.* On those remaining days when Mr. Faircloth would be able to work, Dr. Damle concluded that Mr. Faircloth would be able to sit for two hours, and could not stand or walk at all, during an eight-hour workday. R. 419. Further, Mr. Faircloth could only lift or carry up to ten pounds occasionally, and his condition is a "life-long illness." R. 419-20.

On February 29, 2012, Mr. Faircloth received a transfusion of 1817 units of intravenous factor VIII. R. 433-34. He again complained of pain, nausea, a right knee edema, a lack of mobility and loss of appetite. R. 433.[3]

---

[3] Mr. Faircloth's weekly transfusions required his physical presence at Bon Secours Maryview at least once a week for 2.0 to 4.25 hours at a time. R. 424, 431, 433-34, and 437.

###### C.    The Administrative Hearing – February 22, 2012

At the time of his hearing, held February 22, 2012, Mr. Faircloth lived with his wife and three children ages seventeen, fourteen, and four months. R. 57.  Mr. Faircloth was receiving weekly blood infusion gene therapy to enhance his clotting factor, and was told it may have to increase to twice a week. R. 61-62.  The treatments cause him joint pain, headaches, nausea, and neck pain, and leave him feeling exhausted. R. 64-65.

Mr. Faircloth explained that his hemophilia had progressively worsened causing spontaneous bleeds and the pooling of blood in various parts of the body, which resulted in the loss of his hip joint and a knee problem that would likely lead to a knee replacement. R. 65-68. Mr. Faircloth does not drive, and needs help dressing and bathing. R. 62-63. He cannot lift and carry his four-month-old baby. R. 64.  He has pain and numbness in his hips and knees, and takes Vicodin for pain relief. R. 64.  Mr. Faircloth lost his job due to issues with his hemophilia, bleeding, swelling and pain issues that caused him to be unable to perform his work. R. 68-69. Mr. Faircloth was unsuccessful in his job search, and ultimately realized he could not work due to his condition. R. 60, 68.

Robert Edwards, a vocational expert, testified at the hearing. R. 69-72. The ALJ asked Mr. Edwards if jobs were available for a hypothetical individual with a residual functional capacity "allowing for sedentary work" who could "lift and carry 10 pounds occasionally, sit for six hours in an eight hour day, walk or stand in an eight hour day but should be allowed an opportunity to change positions at will, only occasional bending or stooping, no crawling or crouching or kneeling, no climbing or work at unprotected heights or around dangerous machinery." R. 69-70. Based on that hypothetical, Mr. Edwards testified the individual could work as an office clerk, an order clerk, or an information clerk. R. 70.

Mr. Faircloth's hearing attorney presented Mr. Edwards with a hypothetical consistent with Dr. Damle's opinion, stating, "[t]he oncologist has confirmed that the patient suffers from hemoarthritis [sic.] to hips and knees, experiences pain and swelling in joints, decrease range of motion, pain that reaches levels of severity that would cause the patient to be unable to concentrate or focus or stay on task in the work setting for 50 to 60 percent of the day, would require bed rest during the course of the day between 12 and 14 days of the month, would be able to sit, stand, and walk no more than two hours out of a work day, and finally indicates that this is a life-long illness. If you assume that assessment to be an accurate statement of a claimant's condition, would this person be able to perform any of the jobs that you referred to in your testimony." R. 71-72. Mr. Edwards responded, "[t]hat would eliminate all work." R. 72.

### D.      The ALJ's Decision – March 6, 2012

The ALJ found Mr. Faircloth had not been disabled, as defined by the Social Security Act, from August 1, 2008, through the date of the decision, March 6, 2012. R. 39-48.  Mr. Faircloth met the insured status requirement through December 31, 2009. R. 41. At step one of the five-step analysis, the ALJ concluded that Mr. Faircloth had not engaged in substantial gainful activity since August 1, 2008, the alleged onset date. R. 41.  At step two, the ALJ found that Mr. Faircloth had a number of severe impairments including status post left hip replacement, right knee osteoarthritis, and hemophilia. R. 41.

At the third step, however, the ALJ concluded Mr. Faircloth did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 42.  In doing so, the ALJ concluded, "[t]he claimant's hemophilia has not resulted in spontaneous hemorrhage requiring transfusion at least 3 times during the previous 5 months (Listing 7.08 (Coagulation Defects)), and although he is

obese with musculoskeletal impairments affecting his weight-bearing joints (i.e., his left hip and right knee), he can still ambulate effectively, i.e., he can sustain a reasonable walking pace over a sufficient distance to carry out activities of daily living and can travel without companion assistance to and from a place of employment (see Listing of Impairments, Section 2.00B2b . . . ).” R. 42.

The ALJ found Mr. Faircloth had the residual functional capacity (RFC) to perform a limited range of sedentary work. R. 42.  In reaching this conclusion, the ALJ summarized Mr. Faircloth's testimony regarding his pain, weakness, nausea, and difficulty getting around. R. 43. The ALJ found Mr. Faircloth's statements concerning the intensity, persistence and limiting effects of his symptoms “partially credible.” R. 43.

The ALJ next summarized the medical source opinions. R. 43-44. He noted the non-examining state agency medical consultants found Mr. Faircloth could perform a limited range of sedentary work, must use an assistive device for ambulation, and must alternate between sitting and standing. R. 43.  The ALJ discussed the opinion of the examining state agency medical consultant, Dr. Vaughan, that Mr. Faircloth could sit for two hours, stand for ten minutes and walk for five minutes in an eight-hour day. R. 43.

The ALJ mentioned the opinion of the nurse practitioner, in the application for a disability placard, that Mr. Faircloth was permanently limited or impaired, severely limited in his ability to walk, and could not walk 200 feet without stopping to rest. R. 44.  Next, the ALJ discussed Dr. Damle's opinion that Mr. Faircloth's pain and fatigue would affect his concentration/memory and cause inability to focus an stay on task in a work setting for 50-60% of the day, he would require rest breaks of an hour total in an eight-hour day, and he could not report to work twelve to fourteen days per month on average. R. 44.  The ALJ also recognized

Dr. Damle's opinion that Mr. Faircloth could occasionally lift up to ten pounds, could sit for two hours, and stand or walk for zero hours in an eight-hour day. R. 44.

The ALJ discussed the medical source findings that Mr. Faircloth should avoid exposure to hazards due to a risk of bleeding; he has arthritis in his right knee and left hip resulting in an unsteady or antalgic gait, swelling, decreased range of motion, and weakness; and, his obesity contributes to his limitations. R. 44-45.   The ALJ concluded Mr. Faircloth could "perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with the following additional limitations: He can lift/carry 10 pounds occasionally. He can sit for 6 hours in an 8-hour day and walk/stand for 2 hours in an 8-hour day, but he should be allowed the opportunity to change positions at will.   He can perform work that involves no more than occasional bending or stooping; no crawling, crouching, or kneeling; and no climbing or work at unprotected heights or around dangerous machinery." R. 42.

The ALJ assigned "little weight" to claimant's statements and the medical source opinions that differed from his findings, stating the record did not support their limitations. R. 45.  The ALJ cited Mr. Faircloth's admission that he sought employment during the adjudicatory period. R. 45.  The ALJ found that prior to 2012, Mr. Faircloth's hemophilia was described as mild or very mild, noting he went without treatment for prolonged periods R. 45.  The ALJ further found that Mr. Faircloth's musculoskeletal problems appear to be mild, "[e]xcept for his most recent imaging studies, which show moderate joint effusion in his right knee," "[h]is physical examinations generally showed no signs of active bleeding or complications related to his condition," and "his hemophilia factor is stable with treatment, which has only just recently included regular factor VIII infusions in addition to oral medication." R. 45.  Acknowledging that Mr. Faircloth's impairments may be compounded by his obesity, the ALJ nevertheless found

that "an assistive device does not appear to be necessary, especially if the claimant is already limited to sedentary work with the opportunity to change positions at will." R. 45.  Lastly, the ALJ found Mr. Faircloth's "presentation and medical history" are "inconsistent with severe levels of pain and associated limitations in his cognition." R. 46.  The ALJ concluded Mr. Faircloth could perform a limited range of sedentary work. R. 46.

After finding Mr. Faircloth was not capable of performing any of his past relevant work at step four, the ALJ found at step five that, with Mr. Faircloth's age, education, and residual functional capacity, there were jobs that exist in the national economy he can perform, such as office clerk, order clerk, or information clerk. R. 46-47.  Based on these findings, the ALJ concluded Mr. Faircloth had not been under a disability, as defined by the Social Security Act, from August 1, 2008, through the date of the decision. R. 48.

Mr. Faircloth argues (1) his hemophilia meets the requirements of the Listed impairments, and (2) the ALJ improperly discounted the treating physician opinion on the severity of his condition. Pl.'s Mem. 19-30. The Court cannot find substantial evidence in the record to support the ALJ's decision due to the ALJ's failure to explain his finding at step three, and to appropriately address the medical opinions in the record.

## III.  STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g) (2012); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the [Secretary's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law.  *Coffman,* 829 F.2d at 517.

## IV. ANALYSIS

To qualify for SSI and/or DIB, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application, and be under a "disability" as defined in the Social Security Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

14

than 12 months. 20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

### A.    The ALJ Failed to Adequately Address Whether Mr. Faircloth Met the Criteria for a Listed Impairment

At step three of the sequential disability analysis, the ALJ must determine whether the claimant's impairment meets or medically equals the severity of any disorder in the Listings. 20 C.F.R. § 404.1520(a)(4)(iii). A claimant's impairment meets a Listing if "it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement." *Id.* § 404.1525(c)(3). The impairment medically equals a Listing "if it is at least equal in severity and duration to the criteria of any listed impairment." *Id.* § 404.1526(a). If the claimant proves that his condition meets or equals a listed impairment, "he is conclusively

presumed to be disabled and entitled to benefits." *Bowen v. City of New York,* 476 U.S. 467, 471 (1986).

The ALJ is required to identify the particular Listing relevant to the claimant's condition and compare the medical evidence of the claimant's symptoms to the criteria in the Listing. *See* 42 U.S.C. § 405(b)(1); *Cook v. Heckler,* 783 F.2d 1168, 1173 (4th Cir. 1986); *Schoofield v. Barnhart,* 220 F.Supp.2d 512, 522 (D. Md. 2002). Listing 7.00 discusses hematological disorders, and requires, in pertinent part, that "[c]hronic inherited coagulation disorders must be documented by appropriate laboratory evidence," noting that "[p]rophylactic therapy such as with antihemophilic globulin (AHG) concentrate does not in itself imply severity." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 7.00(D). Further, Listing 7.08 requires "[c]oagulation defects (hemophilia or a similar disorder)" to occur "with spontaneous hemorrhage requiring transfusion at least three times during the 5 months prior to adjudication." *Id.* at § 7.08.

In his decision, the ALJ identifies Listing 7.08, and states Mr. Faircloth's "hemophilia has not resulted in spontaneous hemorrhage requiring transfusion at least 3 times during the previous 5 months." R. 42. The remainder of the ALJ's analysis at this step addresses Mr. Faircloth's ability to ambulate. R. 42.

Mr. Faircloth argues he meets the criteria of Listing 7.08, because he experienced spontaneous hemorrhage requiring transfusion at least three times during the five months prior to adjudication, or alternatively, his impairment is equal in severity to Listing 7.08. Pl.'s Mem. 19-21. In asserting he had spontaneous hemorrhage requiring transfusion at least three times in the five months prior to adjudication, Mr. Faircloth relies on transfusions given on January 7, 2012, January 17, 2012, and February 21, 2012. Pl.'s Mem 20-21. On January 7 and 17, 2012, Mr. Faircloth checked into the emergency room stating he felt like he was bleeding. R. 360, 373. On

both occasions, the doctors noted Mr. Faircloth was bleeding and ordered a transfusion of factor VIII. R. 375 (deciding against an arthrocentesis "as it may cause further bleeding" and ordering a 2,000 unit transfusion); R. 392 (consulting another doctor on the dosing Mr. Faircloth "will need for his bleeding" and ordering a transfusion).[4] The Court agrees with Mr. Faircloth that the records support his argument that he had spontaneous hemorrhage requiring transfusion on both of these occasions.

The third episode Mr. Faircloth describes is less well documented.  On February 16, 2012, Mr. Faircloth reported to Dr. Damle that he was having pain and swelling in his abdomen. R. 426-27.  Dr. Damle's examination revealed a "nodular mass in the epigastric area felt in the subcutaneous tissue." R. 427.  Dr. Damle ordered a CT scan to "assess for bleeding," which was scheduled for February 21, 2012. R. 428.  On February 21, 2012, Mr. Faircloth received a factor VIII transfusion. R. 436-37.  Mr. Faircloth asserts the combination of these two visits evidences a spontaneous hemorrhage requiring transfusion.  The record does not clearly indicate that this third visit represents a spontaneous hemorrhage requiring transfusion, in light of Dr. Damle's notes indicating Mr. Faircloth was to begin weekly prophylactic transfusions. R. 81.

More persuasive is Mr. Faircloth's assertion that even if he did not have three spontaneous bleeds requiring transfusion within the five months prior to adjudication, his history of bleeds, coupled with his weekly prophylactic transfusions, demonstrate Mr. Faircloth's hemophilia is "at least of equal medical significance" to the listed impairment. Pl.'s Mem. 22. Mr. Faircloth experienced, at a minimum, two spontaneous bleeds, and required six transfusions during the five month period prior to adjudication. R. 360, 362, 373, 383, 430, 423, 433, 436.

---

[4] In her treatment notes dated February 1, 2012, Dr. Damle writes Mr. Faircloth "experienced 2-3 episodes of bleeding/hemarthrosis in a 7-10 day period." R. 426.  Mr. Faircloth's memorandum suggests that Mr. Faircloth presented to the emergency room on January 7, 2012, with two spontaneous bleeds due to the fact that he reported feeling "something pop in my hip and in my knee." Pl.'s Mem. 5, R. 373.

The ALJ's one sentence explanation for finding Mr. Faircloth did not meet the criteria for Listing 7.08 is not an adequate explanation for his decision. *See* 42 U.S.C.§405(b)(1) (2012) (requiring the ALJ to explain the reasons for his determination); *Burnett v. Comm'r Soc. Sec. Admin.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (remanding due to ALJ 's conclusory and inadequate step three ruling).

Defendant has requested a remand to allow the ALJ to "reconsider all of the evidence, consider the evidence that [Mr. Faircloth] submitted to the Appeals Council, and consider the evidence Mr. Faircloth submitted in connection with subsequent claims, to further evaluate whether any listing is met (specifically, Listing 7.08)." Def.'s Mem. 3. The Court agrees a remand under the circumstances is necessary to allow the ALJ to determine whether Mr. Faircloth meets the criteria for a listed impairment.

### B. The ALJ Failed to Adequately Explain the Decision to Discount the Weight of the Medical Source Opinions

The ALJ's assignment of "little weight" to the medical sources, including the opinion of Mr. Faircloth's treating oncologist Dr. Damle, to the extent they differed from the ALJ's RFC determination resulted in a decision for which there is no substantial evidence in the record. R. 45. The regulations provide that after step three of the ALJ's five-part analysis, but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC. 20 C.F.R. §§ 404.1545(a). The RFC is a claimant's maximum ability to work despite his limitations. *Id.* at 404.1545(a)(1). The ALJ then uses that RFC to determine whether the claimant can perform his past relevant work. *Id.* at § 404.1545(a) (5). The determination of RFC is based on a consideration of all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1545(a)(3).[5]

---

[5] "Other evidence" includes statements or reports from the claimant, the claimant's treating, or nontreating sources,

In making the RFC determination, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians. Under the federal regulations and Fourth Circuit case-law, a treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(d)(2). Conversely, "if [a] physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. However, a finding that a treating physician's opinion is not well-supported by medically acceptable clinical and diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. SSR 96-2, 1996 WL 374188, at *4 (S.S.A.).

The regulations require the ALJ to evaluate every medical opinion. Accordingly, even if a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors" provided by the regulations. *Id.* at *5. Those factors are: (1) "[l]ength of treatment relationship and the frequency of examination;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527(d)(2)-(6).

Under the applicable regulations, the ALJ is required to explain in his decision the weight assigned to *all* opinions, including treating sources, non-treating sources, State agency consultants, and other nonexamining sources. 20 C.F.R. § 416.927(e)(2)(ii). Therefore, when the

---

and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptom affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

ALJ's decision is not fully favorable to the claimant, the decision must contain

> specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2, 1996 WL 374188, at *5 (S.S.A.). This specificity requirement is necessary because

the reviewing court

> face[s] a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the records as a whole to determine whether the conclusions reached are rational.'

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d

396, 397 (4th Cir. 1974)).

After summarizing the medical source statements, the ALJ concluded Mr. Faircloth could

perform sedentary work, which allowed him to change positions at will, only required occasional

bending or stooping, and required no climbing, crouching, crawling, kneeling, work at

unprotected heights or work around dangerous machinery. R. 45.  The ALJ assigned

> little weight to statements from [Mr. Faircloth] and the [] medical sources to the extent they differ from these findings, such as statements that the claimant requires an assistive device for ambulation or has such severe pain that he requires frequent rest breaks throughout the workday.

R. 45.

The ALJ failed to consider the necessary factors and recite good reasons for discounting

the opinions of all of the medical sources in the record, especially the opinion of Mr. Faircloth's

treating oncologist Dr. Damle. Dr. Damle began treating Mr. Faircloth on February 1, 2012, and

continued treating him through the date of the ALJ's decision. R. 80-82, 418-20. As Dr. Damle had only been treating Mr. Faircloth a matter of months prior to the ALJ's decision, the first two factors the ALJ should have considered, concerning the length and nature of the treatment relationship, are not strong factors weighing in favor or Dr. Damle's opinion. 20 C.F.R. § 404.1527(d)(2)-(6). However, the remaining three factors (supporting explanations, consistency with the record, and the specialization of the physician) weigh heavily in favor of Dr. Damle's opinion. *Id.* Moreover, Dr. Damle's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(c)(2).

Dr. Damle, an oncologist, performed physical examinations of Mr. Faircloth, as well as reviewing his medical history, blood tests, x-rays of both knees, an MRI of Mr. Faircloth's right knee, and a CT scan of his right lower extremity. R. 81-82, 427-28. She noted Mr. Faircloth had a previously documented factor VIII level of 4%. R. 80. Dr. Damle concluded Mr. Faircloth has chronic disabling arthritis following hemarthrosis, and avascular necrosis of the left hip, secondary to hemophilia. R. 427. In Dr. Damle's opinion, Mr. Faircloth's condition caused him pain and fatigue sufficient to affect his concentration and to create an inability to stay on task in a work setting for 50-60% of the day, would require him to take rest breaks totaling more than one hour in an eight-hour day, and would keep him from working at any level of exertion for twelve to fourteen days per month. R. 418-20. She further opined Mr. Faircloth would be able to sit for two hours, but would not be able to stand or walk in an eight-hour day, and could lift or carry up to ten pounds occasionally. *Id.*

Dr. Damle's opinion is consistent with the opinion of the state agency physician, Dr. Vaughan, who performed a consultative examination of Mr. Faircloth in 2010. R. 347-51. Dr. Vaughan found Mr. Faircloth provided "his best effort during the examination," and concluded

Mr. Faircloth could "be expected to sit for 2 hours, stand 10 minutes and walk 5 minutes at a time in an eight hour work day before requiring a break due to pain instability of left hip and right knee." R. 351. He found that Mr. Faircloth needed "an assistive device" in order to walk "short distances, long distances and uneven terrain." *Id.* Finally, he concluded that Mr. Faircloth could not bend, stoop, crouch, or perform similar activity "due to lower extremity instability and pain" and that Mr. Faircloth could "carry 10 pounds frequently and 20 pounds occasionally." *Id.*

Further, Dr. Damle's opinion is consistent with the treatment notes of Dr. Luciano-Perez, with Virginia Orthopaedic & Spine Specialists, who reviewed three x-rays of Mr. Faircloth's right knee revealing degenerative changes, which were moderate in severity, and an MRI, which showed a moderate sized joint effusion, and mild degenerative joint disease. R. 388. The doctor noted the pain in Mr. Faircloth's right knee was constant and severe to extremely severe; with swelling, numbness, and weakness, which was worsening. R. 387.

Dr. Damle's opinions are also consistent with the nurse practitioner, who filled out a certification for a disabled parking placard in 2012 indicating Mr. Faircloth was severely limited in his ability to walk, could not walk without use of a cane, and could not walk more than 200 feet without stopping to wrest. R. 416-17.

The only medical opinions in the record deviating from Dr. Damle's in any significant way are the opinions of the non-examining state agency physicians who found Mr. Faircloth capable of a limited range of sedentary work. R. 101-106, 120-29.  In addition to not examining Mr. Faircloth prior to rendering their opinions, these doctors' opinions were given based on Mr. Faircloth's medical record as it existed in 2010 and 2011, prior to Mr. Faircloth's emergency room visits for spontaneous bleeds necessitating prophylactic weekly transfusions. *Id.*  This was also prior to the diagnostic tests relied upon by Dr. Damle and Dr. Luciano-Perez. *Id.*

What is more troubling is the ALJ's RFC, which placed fewer restrictions on Mr. Faircloth's ability to work than the non-examining physicians found necessary in 2010 and 2011. R. 45. There is no support in the record for the ALJ's finding that "an assistive device does not appear to be necessary," contrary to every medical source opinion in the record. R. 45. It is well-settled that an ALJ should not substitute his own untrained medical opinion for that of a medical professional. *Wilson v. Heckler,* 743 F.2d 218, 221 (4th Cir.1984).

In support of his decision to assign "little weight" to almost all of the medical opinions in the record, the ALJ cited Mr. Faircloth's admission that he sought employment during the adjudicatory period. R. 45. The fact that Mr. Faircloth unsuccessfully sought employment is not evidence that he was not disabled.

Next, the ALJ found that prior to 2012, Mr. Faircloth's hemophilia was described as mild or very mild, noting he went without treatment for prolonged periods, "[h]is physical examinations generally showed no signs of active bleeding or complications related to his condition," and "his hemophilia factor is stable with treatment, which has only just recently included regular factor VIII infusions in addition to oral medication." R. 45. The record demonstrates Mr. Faircloth's hemophilia and accompanying hemarthrosis and degenerative arthritis, are progressing, and his symptoms have worsened over time. R. 65; 426-27. In 2012, Mr. Faircloth's hemophilia was described as "moderate [in] severity." R. 392. While the evidence cited by the ALJ may be relevant to whether Mr. Faircloth was disabled on his alleged onset date in 2008, it is not persuasive for finding he was not disabled in 2012.

The ALJ further found that Mr. Faircloth's musculoskeletal problems appear to be mild, "[e]xcept for his most recent imaging studies, which show moderate joint effusion in his right knee." R. 45. Dr. Luciano-Perez, with Virginia Orthopaedic & Spine Specialists, found three x-

rays of Mr. Faircloth's right knee revealed degenerative changes, which were moderate in severity, and an MRI showed a moderate sized joint effusion, and mild degenerative joint disease. R. 387-88. Here again, the ALJ has not made allowance for the progressive nature of Mr. Faircloth's disease.

Lastly, acknowledging that Mr. Faircloth's impairments may be compounded by his obesity, the ALJ nevertheless found that "an assistive device does not appear to be necessary, especially if the claimant is already limited to sedentary work with the opportunity to change positions at will." R. 45. The ALJ's rationale for rejecting the medical source opinions on this issue was, "[t]he State agency medical consultants appeared to base their finding regarding an assistive device on limited evidence rather than the longitudinal record. . . and Ms. Raines' statements in January 2012 which were not even in the Social Security disability context, are unsupported by the claimant's treatment history and objective medical findings, including findings from his orthopedic and other doctors." R. 45. The ALJ's rationale is incorrect. As discussed above, every medical source, including the treating physicians, the consultative medical examiner, and the non-examining state agency physicians, agreed Mr. Faircloth required an assistive device to walk. R. 101, 102, 125, 351, 362.

The Court finds there is not substantial evidence in the record to support the denial of DIB and SSI to Mr. Faircloth. The Court finds the ALJ failed to give appropriate weight to the medical source opinions, especially the opinions of Mr. Faircloth's treating oncologist, Dr. Damle, and the opinion of the state agency physician who performed a consultative examination of Mr. Faircloth, Dr. Vaughan.  The records the ALJ cites do not support his findings regarding Mr. Faircloth's RFC.

When the decision of the Commissioner is appealed, the court has the statutory authority

to reverse the administrative decision or remand the case for further proceedings. 42 U.S.C. § 405(g); *Coffman v. Bowen,* 829 F.2d 514, 519 (4th Cir.1987); *Vitkek v. Finch,* 438 F.2d 1157, 1157–58 (4th Cir.1971). Mr. Faircloth has requested that the decision of the Commissioner be reversed for an immediate award of benefits, relying in part on Defendant's admission that the facts outlined in Mr. Faircloth's motion for summary judgment are not in dispute. Mem. in Suppt. Def.'s Mot. to Remand 1; Pl.'s Reply 3. While the evidence appears overwhelming in support of a finding of disability on the date of the ALJ's decision, March 6, 2012, the evidence is less settled with respect to the alleged onset date of August 1, 2008. R. 39. Consequently, the Court recommends the case be REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g). On remand, the ALJ is required to re-weigh all of Mr. Faircloth's evidence, including evidence submitted to the Appeals Council and evidence submitted in connection with his subsequent claims. The ALJ must explain the decision regarding whether Mr. Faircloth meets the criteria of a listed impairment, assign appropriate weight to the medical opinions in the record with adequate explanations for the weight given, and address the progressive nature of Mr. Faircloth's disease when determining whether to award DIB and SSI.

## V. RECOMMENDATION

For the foregoing reasons, the Court recommends that Mr. Faircloth's Motion for Summary Judgment (ECF No. 10) be GRANTED to the extent it requests remand and DENIED to the extent it requests an immediate award of benefits; the Commissioner's Motion for Remand (ECF No. 17) be GRANTED; the final decision of the Commissioner be REVERSED, and the case be REMANDED for further proceedings consistent with this recommendation.

## VI. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28

U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/
Tommy E. Miller
United States Magistrate Judge

Norfolk, Virginia
February 27, 2014